SAN MIGUEL & CÍA, INC., demandante y recurrida, *v.* FRANK SANTIAGO LAVANDERO ET AL., y FINANCIAL CREDIT CORPORATION, demandados y recurrente la segunda.

Número: 49.     Resuelto: 12 de febrero de 1963.

*Juan Enrique Géigel, Guillermo Silva, Jaime A. García Blanco, Hernán C. Pesquera y Vicente Santori Coll,* abogados de la recurrente; *Francisco Ponsa Feliú y Álvaro J. Calderón, Jr.,* abogados de la recurrida.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

PER CURIAM: Ciertos muebles—58 unidades en total—vendidos mediante contratos de venta condicional debidamente inscritos a nombre de San Miguel & Cía. fueron reposeídos extrajudicialmente por un agente de esta última sin conocimiento de su principal. El agente los vendió nuevamente mediante contratos de venta condicional a otras personas. Estos últimos contratos fueron adquiridos por Financial Credit Corporation e inscritos según dispone la ley.

San Miguel & Cía., incoó pleito contra su agente, los fiadores de éste y contra Financial Credit Corporation. El tribunal de instancia declaró con lugar la demanda contra todos y condenó a la Financial a pagarle a San Miguel & Cía. $31,501.85, que era la cantidad de que respondían las 58 unidades cuyos contratos estaban inscritos con rango registral preferente a nombre de San Miguel & Cía. El agente y los fiadores no solicitaron revisión de la sentencia dictada en contra de ellos por la cantidad de $106,277.53. La sentencia condenó a todos los demandados a pagar solidariamente la cantidad de $15,000 de honorarios de abogado.

El tribunal de instancia funda su fallo en contra de Financial Credit en dos premisas. Una, que la Financial Credit expresamente convino con San Miguel & Cía. en pagarle las cantidades que estaban garantizadas por los contratos de venta condicional inscritos a su nombre. Otra, que como cuestión de ley, Financial Credit estaba obligada a pagarlas.

Para sostener su recurso Financial Credit le imputa al tribunal sentenciador que "incurrió en grave error de hecho y de derecho al concluir, sin prueba alguna en que sostener semejante conclusión, que Financial Credit Corporation reconoció que San Miguel & Cía. Inc. tenía un derecho preferente sobre las cincuenta y ocho unidades objeto de doble venta y de doble financiamiento; y que reconoció y aceptó, asimismo responsabilidad ante San Migual & Cía. Inc. por el importe del total de lo adeudado a ésta bajo las cincuenta

y ocho unidades; y por último, que contrajo la obligación y convino en pagar a dicha San Miguel & Cía. Inc. la correspondiente cantidad".

La corte a quo al fallar hizo la siguiente determinación de hecho que fue ampliada por resolución de 4 de septiembre de 1958. Expresa lo siguiente la determinación original y la ampliada por resolución posterior:

"10.—Allá para el 15 de mayo de 1952, en conferencia celebrada entre los directores y oficiales autorizados de San Miguel & Cía. y Financial Credit Corporation, ésta última reconoció el derecho preferente de la demandante sobre las unidades objeto de las dobles ventas. Igualmente Financial Credit Corporation reconoció y aceptó su responsabilidad frente a la demandante por el valor total del crédito de San Miguel & Cía. bajo los contratos negociados por Frank Santiago Lavandero a San Miguel & Cía. cubriendo las unidades objeto de doble venta y se obligó a pagar a San Miguel & Cía. dicha cantidad total. A los fines de determinarse la responsabilidad así aceptada por Financial Credit Corporation, se acordó entre ésta y la demandante en reunión celebrada en la fecha arriba mencionada encomendar a dos contadores, uno en representación de cada una de las dos partes, el estudio y análisis de los contratos de doble venta. Dicho estudio fue hecho por el Sr. Miguel A. León en representación de Financial Credit Corporation y el Sr. Guillermo Machargo en representación de San Miguel & Cía., y según el informe conjunto rendido, al cual el tribunal da crédito, la cantidad total a que asciende el crédito de San Miguel en los contratos aludidos es de $34,859.10. Financial Credit Corporation asumió la obligación de pagar y convino en pagar a la demandante la cantidad que arrojara el estudio conjunto de los señores León y Machargo, y adeuda por tanto a la demandante la dicha cantidad de $34,859.10. Por haber asumido Financial Credit Corporation dicha obligación fue que San Miguel & Cía. desistió de reposeer las unidades doblemente vendidas y consintió en que Financial Credit Corporation continuara cobrando los plazos de los segundos compradores condicionales, lo cual hizo Financial Credit Corporation hasta la total liquidación de dichos contratos."

"Alega la demandada Financial Credit Corporation en su moción de reconsideración, impugnando la conclusión de hecho

número (10) que la evidencia presentada no sostiene dicha conclusión, es decir, que la prueba es insuficiente para dar apoyo a la misma. Y alega dicha demandada que ninguna de las declaraciones de los testigos que declararon, incluyendo a los de la demandante, sostiene la referida conclusión. Dicha demandada insiste en que la aceptación del derecho preferente de la demandante hecha en la reunión celebrada el 15 de mayo de 1952 fue condicional según la propia prueba de la demandante. A ese efecto, insiste en que según el testimonio del propio señor Marcelino San Miguel en dicha reunión los testigos de Financial Credit Corporation 'reconocieron que si la situación es como nosotros alegábamos' San Miguel incuestionablemente tenía el derecho preferente sobre las unidades objeto de doble venta.

"Resolvemos que de acuerdo con la prueba presentada, incluyendo los propios testigos ofrecidos por Financial Credit Corp., el 15 de mayo de 1952, a solicitud de San Miguel & Cía., se celebró en las oficinas de ésta una reunión en la cual estuvieron presentes representantes de San Miguel & Cía. y de Financial Credit Corp. No hay controversia en cuanto a quienes fueron las personas que estuvieron presentes. El Sr. Marcelino San Miguel explicó la situación surgida con motivo de las actuaciones del demandado Frank Santiago Lavandero, consistentes en los siguientes hechos: (1) que este último había reposeído extra-judicialmente de los compradores condicionales cuyos contratos habían sido negociados a San Miguel, un número de unidades; (2) que Santiago Lavandero había vendido de nuevo dichas unidades, también bajo contratos de venta condicional, los cuales habían sido negociados a Financial Credit Corporation; (3) que los contratos negociados a San Miguel & Cía, y en poder de ésta estaban inscritos en los registros de ventas condicionales con anterioridad a los segundos contratos que sobre las mismas unidades había negociado el demandado Santiago Lavandero a Financial Credit Corporation; (4) que San Miguel & Cía. no autorizó ni consintió en estas actuaciones de Frank Santiago Lavandero, y que se enteró de ellas poco tiempo antes de la reunión del 15 de mayo de 1952. En esta reunión los representantes de Financial Credit Corporation alegaron desconocer esos hechos, pero aceptaron su responsabilidad frente a San Miguel & Cía. si efectivamente las mencionadas alegaciones de esta última eran 'auténticas'. Es decir, que había que comprobar antes si las alegaciones de San Miguel sobre la situación eran verdaderas y se ajustaban a la

realidad. De ser así, Financial Credit Corporation reconocía el crédito preferente de ésta bajo sus contratos de ventas condicionales y se obligaba a pagarle. Por acuerdo mutuo las dos partes designaron cada una de ellas un contable para analizar y estudiar conjuntamente todos los contratos objeto de las transacciones de doble venta, para comprobar las alegaciones del Sr. Marcelino San Miguel y para determinar con exactitud el valor del crédito de San Miguel bajo dichos contratos. Ante este acuerdo, San Miguel & Cía. se abstuvo de proceder judicialmente a defender sus derechos mediante la reposesión de los equipos, y consintió en que Financial Credit Corp. continuara cobrando los plazos de los segundos compradores. Efectivamente, la prueba de la propia demandada Financial Credit Corporation estableció que todos estos contratos fueron totalmente liquidados y cobrados por Financial Credit Corporation, bien de los compradores condicionales mismos por medio de plazos pagados por éstos, o mediante cargos a la reserva de Frank Santiago Lavandero en poder de Financial Credit Corporation, la cual ascendía a $19,327.09, y que se adjudicó totalmente Financial Credit Corporation. Los segundos contratos, adquiridos de Santiago Lavandero por Financial Credit Corp. tenían un valor total de $34,838.55 (¹) cantidad ésta que Financial Credit Corporation tenía derecho a cobrar de los compradores condicionales en dichos contratos, y que según hemos dicho, según su propio testimonio, cobró totalmente.

"La prueba concluyentemente demuestra que las 'alegaciones' de San Miguel & Cía. en la reunión del 15 de mayo de 1952, eran 'auténticas'. Ha quedado demostrado que por las investigaciones conducidas con posterioridad a esa fecha, quedaron plenamente confirmadas y comprobadas las alegaciones del señor San Miguel. Es decir, el Tribunal entiende, y así lo declara probado, (1) que Frank Santiago Lavandero reposeyó extrajudicialmente de los compradores condicionales en los contratos negociados a San Miguel & Cía. 58 unidades de refrigeración; (2) que Santiago Lavandero vendió de nuevo dichas unidades mediante nuevos contratos de venta condicional, y que

---

(¹) El informe de Sparrow Waymouth Co. de fecha 10 de junio de 1952 (Exhibit F de Financial Credit Corp.) arroja un total de $35,051.11, pero a esta cantidad hay que restar el contrato de Crisanto Rijos de un valor de $212.56 porque el primer contrato sobre la misma unidad, a nombre de Julia Muñoz, no está incluído en el informe conjunto de León y Machargo.

estos segundos contratos los negoció o descontó con Financial
Credit Corp.; (3) que los contratos originales adquiridos por
San Miguel y en su poder, estaban inscritos en los registros
correspondientes de ventas condicionales en fecha anterior a
la fecha de inscripción de los segundos contratos, adquiridos por
Financial Credit Corporation, con excepción de dos casos, a
saber: el contrato de Julia Muñoz y el de Pablo Portalatín;
(4) que ni San Miguel & Cía. ni ninguno de sus representantes,
oficiales o directores autorizó a Frank Santiago Lavandero a
hacer las reposesiones extrajudiciales aludidas, y que éstas
fueron hechas por Santiago Lavandero a espaldas de San
Miguel y encubiertas intencionalmente por Santiago Lavandero
de modo que San Miguel no las descubriera.   Precisamente al
enterarse de estos hechos poco tiempo antes del 15 de mayo
de 1952, fue que San Miguel, luego de hacer ciertas comproba-
ciones parciales, provocó la reunión celebrada en esa fecha para
los fines y con los resultados indicados.   Habiéndose compro-
bado a cabalidad que las alegaciones de San Miguel en la
reunión del 15 de mayo de 1952 eran correctas, el Tribunal tiene
la más plena y completa convicción de que Financial Credit
Corporation está obligada, según convino, a pagar a San Miguel
& Cía. la cantidad que representa el valor para San Miguel de
los primeros contratos sobre las unidades doblemente vendidas.
Hemos determinado en la sentencia dictada que dicha cantidad
asciende a $34,859.10 según se determinó por el informe con-
junto de los señores León y Machargo, en representación de
Financial Credit Corporation y San Miguel & Cía., respectiva-
mente.   Pero también hemos resuelto que dos de los contratos
de Financial Credit Corp. fueron inscritos antes que los de San
Miguel & Co., a saber, el de Pablo Portalatín (el comprador en
el contrato de Financial Credit Corp. es Mario Real), y el de
Julia Muñoz (el comprador en el contrato de Financial Credit
Corp. es Crisanto Rijos).   De estos dos contratos sólo el pri-
mero está incluído en el informe conjunto de León y Machargo,
y el crédito de San Miguel & Cía., bajo el mismo, que asciende
a $134.60, debe ser restado del total arrojado por dicho informe.
Igualmente, demostrando la prueba que en el año 1954 San
Miguel reposeyó las unidades cubiertas por los contratos de
Juan Martínez Rodríguez (Crédito de San Miguel, $486.00);
Ramón Soto Valentín (Crédito de San Miguel, $365.80); Toll
& Rivera (Crédito de San Miguel, $1,380.00) ; Consuelo Barroso
(Crédito de San Miguel $190.85) ; y Joaquín Torres Moreno

(Crédito de San Miguel, $800.00) ; estas cantidades deben ser restadas también del total demostrado por el informe de León y Machargo. De ese modo la cantidad adeudada por Financial Credit Corporation a San Miguel queda reducida a $31,501.85, y la sentencia dictada debe modificarse en ese sentido."

■ Analizada toda la evidencia que tuvo ante su consideración el juez de instancia encontramos que las determinaciones de hechos anteriormente transcritas están ampliamente sostenidas por la prueba.

La prueba demuestra que el 15 de mayo de 1952 se celebró una reunión en la cual estuvieron presentes representantes de San Miguel & Cía. y Financial Credit Corporation. Estuvieron presentes además abogados de ambas entidades. Al momento de celebrarse la reunión San Miguel, Inc., estaba lista para radicar sendas demandas para reposeer las unidades que estaban gravadas con contratos inscritos a su favor. Convino con Financial Credit Corporation en no radicar las referidas demandas, así como no enviar las cartas explicándole la situación a los segundos compradores en cuya posesión estaban las unidades. [1] Convino además, en que Financial Credit continuara cobrando los plazos que le adeudaban los segundos compradores. Por su parte Financial Credit convino en pagar a San Miguel las cantidades garan-

---

[1] "Dirección

Re: Nevera International Harvester Modelo U-95, Serie 06519, Unidad 18865 M9 Contrato de Venta Condicional # 1849 Fechado 28 de abril de 1950, Inscrito en Folio 11496 del Municipio de Bayamón, P. R.

Muy señor nuestro:
Para nuestra sorpresa nos hemos enterado de que el equipo arriba descrito se encuentra en su poder.
Por si tales informes fuesen ciertos, nos permitimos recordarle que esta firma es la única legítima dueña del referido equipo a virtud del contrato de Venta Condicional que también se menciona arriba con su fecha, del que somos cesionarios desde dicha misma fecha, según consta claramente del Registro público correspondiente y de la documentación en nuestro poder.
Sería de mutua conveniencia que a vuelta de correo usted nos escribiese confirmando o negando esa información a los fines pertinentes,

tizadas por los contratos inscritos con anterioridad a su favor. Lo único que quedó por determinarse era si los contratos de San Miguel habían sido inscritos con anterioridad a los de Financial Credit y constatar la cantidad exacta envuelta.

En adición al testimonio del Sr. San Miguel, que obviamente tenía que ser a favor de su contención, hay otra prueba que sostiene la determinación del tribunal de instancia. El testigo Miguel J. Fernández, uno de los directores de Financial Credit, presente en la referida reunión declaró así contestando una pregunta del Juez que presidió la vista:

"Hon. Juez:

Fernández, perdóneme. Él lo que le pregunta que precisamente porque era mutuamente era un convenio; era una cosa que se estaba arreglando en amistad lo que dijo San Miguel, lo que él ha dicho, que se comprometió a no radicar las demandas, a no enviar las cartas, a no cobrar plazos sino dejar que la Financial Credit cobrara. Hay un convenio mutuo en amistad. Ahora, a cambio de eso, ¿qué se comprometió hacer Financial Credit Corporation?

"Fernández:

Financial Credit Corporation, se comprometió a si esos hechos eran así, y San Miguel tenía derecho preferente, pues, que entonces Financial Credit asumiría la parte que le correspondiese de ese derecho preferente del señor San Miguel, o de la firma San Miguel.

Entonces el abogado de San Miguel le pregunta:

P. ¿Cuándo usted dice que Financial Credit asumiría quiere decir que pagaría?

R. Financial Credit.

P. ¿Pagaría?

R. Pagaría Financial Credit.

P. ¿A San Miguel?

R. Sí, lo que . . .

entendiéndose que de no recibir de usted contestación negativa dentro de una semana a partir de esta fecha, daremos por sentado que tal información es exacta.

"Con gracias anticipadas por la atención que se sirva dispensar a la presente, quedamos de usted,

Muy atentamente."

P. Fuera.

R. Lo que fuese después. Y estas fueron palabras del abogado de nosotros en aquella época. Después que se probase el derecho preferente de la firma San Miguel, lo que dijo el abogado, para nosotros estaba bien y más."

El testimonio de Miguel A. León, contador público que para la fecha en que se efectuó la reunión trabajaba para Sparrow Waymouth & Co. que eran los auditores de Financial Credit, es revelador de lo que allí aconteció. A León se le encomendó junto con un representante de San Miguel hacer una investigación de los contratos para determinar a favor de quien, si de San Miguel o de Financial Credit se habían inscrito con preferencia. Declara que "el propósito de la investigación era determinar la responsabilidad que tuviera finalmente cualquiera de las dos corporaciones que tuviera la inscripción primaria de estos contratos y pagar a la otra". A la pregunta de ¿qué quiere decir "cualquiera de las dos que tuviera la inscripción primaria pagar a la otra? contesta "En aquél momento en que se hablaba Financial Credit no tenía el conocimiento de si eran ellos o si era San Miguel & Cía. quien tenía inscrito el contrato de venta condicional". Sigue explicando que se quería determinar quién los había inscrito primero, para determinar cuál debía pagarle a la otra.

Que en verdad se convino lo que el juez determinó lo comprueba además del testimonio transcrito, una carta escrita por el Lic. Géigel de fecha 2 de julio de 1952 en contestación a una del Sr. San Miguel. En ella se dice:

"Exprese también (refiriéndose a la reunión del 15 de mayo) con absoluta claridad que, como abogado de Financial Credit Corporation, reconocía sin reserva alguna que si San Miguel & Cía., Inc. tenía inscritos a su favor los contratos de ventas condicionales anteriores a los descontados por Financial Credit Corporation, San Miguel & Cía., Inc. tendría el derecho preferente que le concede la Ley de Ventas Condicionales, derecho que en forma alguna habría de negar o impugnar Financial Credit Corporation." (Ex. 10 demandante.)

Sin entrar a considerar si de acuerdo con la ley en un caso con hechos como el presente tiene preferencia el contrato que primero se inscribe, ver *Caribe Motors* v. *Petrilli,* 86 D.P.R. 682 (1962), lo cierto es que esta carta revela que así lo entendía Financial Credit y puede inferirse lógicamente que por haberlo entendido así convino en pagarle a San Miguel las cantidades garantizadas por los contratos inscritos a su nombre. Ahora, como el día en que se celebró la reunión Financial Credit no tenía certeza de que los contratos a favor de San Miguel hubieran sido inscritos con preferencia a los suyos, ni se sabía la cantidad exacta envuelta, se determinó nombrar dos personas para que investigaran esa cuestión. Lo único que quedó pendiente era constatar si en verdad San Miguel tenía contratos inscritos previamente sobre los mismos muebles que estaban gravados a favor de Financial y fijar además la cantidad total envuelta. Si eso se comprobaba, Financial pagaría a San Miguel la cantidad que resultare de la investigación. Claramente San Miguel no iba a permitir que Financial siguiera cobrando los plazos que se le adeudaban de acuerdo con sus contratos, como así lo hizo, y San Miguel cruzarse de brazos para que en fin de cuentas Financial sólo le reconociera un derecho.

En vista de la conclusión a que hemos llegado en cuanto al primer error apuntado, huelga considerar el segundo que ataca la conclusión del tribunal de instancia al efecto de que Financial Credit estaba obligada en derecho a pagar a San Miguel & Cía. las cantidades reclamadas.

En cuanto al tercer error apuntado, la recurrente debe prevalecer en su pretensión de que se reduzca en $5,938.44 la suma de dinero que está obligada a pagar.

En su alegato la demandante expone que tiene dudas sobre la procedencia de esta partida y durante la vista oral el abogado de la demandada hizo referencia a lo anterior como una admisión por parte del abogado de la demandante y ésta asintió.

· La recurrente sostiene que de la cantidad que el tribunal de instancia determinó que Financial debía pagar a San Miguel en adición a la partida antes referida deben deducirse otras.   Específicamente las siguientes:

| "Compradores Originales | Segundos Compradores | Balance Adeudado a San Miguel & Cía. en el contrato original |
|---|---|---|
| Flora Rivera | Lucas Rodríguez Sánchez | $256.00 |
| Toll y Rivera | Ernesto Santos Espada | 1,380.00 |
| Consuelo Sánchez | Mercedes Colón Vda. Negrón | 249.90 |
| Nicomedes Maisonet | Eurípides Rivera | 314.56 |
| Fructuoso Rosado Narváez | Francisco Batista Ríos | 720.00 |
| Alejandro Colón | Efraín Torres Rivera | 432.00 |
| Consuelo Barroso | Consuelo Barroso Martínez | 180.95 |
| Andrés Figueroa López | Pedro Miranda | 522.50 |
| Alfredo L. Méndez | Alfredo L. Méndez | 330.00 |
| Emiliano Rivera | Hotel Villa Borinquen | 660.00 |
| Vicente Mileán Balseiro | Natividad Cesárez | 459.00 |
| Armando de Jesús | Víctor Chaparros | 329.75 |
| Juan Martínez | Plácido E. Colón | 349.65 |
| Total...................... | | $6,184.31" |

La sentencia del tribunal de instancia en reconsideración dedujo de la cantidad concedida tres de las partidas que ahora la recurrente sostiene deben deducirse a saber: las referentes a Toll & Rivera, Juan Martínez y Consuelo Barroso.

En cuanto a las otras, la prueba demuestra que San Miguel tuvo conocimiento de las transacciones efectuadas por su agente a fines o principios de marzo del año 1952, y los contratos de venta que fueron financiados por la recurrente

se celebraron durante esa época. Es difícil, si no imposible, determinar con certeza que San Miguel tuviera conocimiento de que su agente estaba en esos precisos momentos reinci-diendo en una conducta que precisamente la demandante estaba investigando. El único conocimiento que tenía San Miguel era de que lo había hecho en el pasado, pero no de que lo estaba haciendo mientras practicaba una investigación para determinar si lo hacía. Las unidades pudieron concebiblemente haber sido reposeídas con anterioridad y el agente hacer la nueva transacción a espaldas de San Miguel.

Por último, el agente abonó a San Miguel $30,000 y la recurrente sostiene que esa cantidad debe prorratearse entre todas las acreencias que tenía San Miguel contra su agente. Este planteamiento ignora que Financial se comprometió a pagarle a San Miguel las cantidades garantizadas por los contratos de venta condicional en poder de San Miguel, porque entendía que San Miguel de acuerdo con la ley tenía derecho a ello. Si eso era así, cualquier pago que hiciera el agente era para abonarlo a sus otras cuentas con San Miguel.

■ La demandada impugna la imposición de intereses desde la radicación de la demanda. Sostiene que sólo procedían desde la fecha en que se dictó sentencia. No tiene razón. La suma reclamada era una líquida y en estos casos procede la imposición de intereses desde la fecha de la radicación de la demanda. *Martínez Fernández & Cía.* v. *García*, 68 D.P.R. 391 (1948).

■ Considerando ahora la condena de honorarios, $15,000 solidariamente con los otros demandados, nos parece, que atendidas todas las circunstancias, es excesiva en cuanto a la recurrente se refiere. Independientemente de lo complicado y trabajoso que fuera el pleito entre San Miguel y su agente, la realidad es que la única controversia existente entre San Miguel y la Financial Credit era una cuestión de

hecho: determinar si en la reunión del 15 de mayo se había convenido lo que alegaba la demandante. Era una cuestión sencilla y clara, carente de complicaciones legales. Por esta razón una condena de $3,500 para honorarios, en cuanto a la Financial se refiere es más razonable.

*Modificada la sentencia en la forma que surge de la opinión, se confirmará.*

